# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| MICHAEL SHANDELON BROWN, | ) |
|---|---|
| Movant, | ) |
| v. | ) Case No. CIV-18-764-G |
| UNITED STATES OF AMERICA, | ) |
| Respondent. | ) |

## OPINION AND ORDER

Now before the Court is Michael Shandelon Brown's Motion to Vacate, Set Aside, or Correct Sentence (Doc. No. 1) under 28 U.S.C. § 2255.[1] After careful consideration of the parties' arguments, the relevant authorities, and the case record, the Court determines that no evidentiary hearing is necessary and that the Motion should be denied on the existing record.[2]

## BACKGROUND

Following a jury trial in April 2016, Mr. Brown ("Defendant") was convicted of conspiracy to possess with intent to distribute cocaine base (crack cocaine) and money-laundering conspiracy. *See* Jury Verdict (Doc. No. 644) at 9-10. The Court sentenced Defendant to 10 years' imprisonment on each count, to be served concurrently. *See* J. (Doc. No. 815) at 2. On April 11, 2018, Defendant's convictions were affirmed by the

---

[1] The United States filed a Response in the associated criminal case. *See United States v. Brown*, 15-cr-93-G (Doc. No. 1015).

[2] No evidentiary hearing is required where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also United States v. Lopez*, 100 F.3d 113, 121 (10th Cir. 1996).

United States Court of Appeals for the Tenth Circuit. *See* Order & J. (Doc. No. 996). The Tenth Circuit's order details the relevant factual and procedural history. *See id.* at 2-12. This opinion assumes familiarity with that account and merely summarizes the events leading up to Defendant's arrest and the evidence of his guilt.

In 2014, a multi-agency investigation implicated Defendant in an Oklahoma City-based drug-trafficking conspiracy spearheaded by Daryl Ingram, Defendant's codefendant and longtime friend. On November 7, 2014, officers executed a series of search warrants at residences associated with the conspiracy. *Id.* at 3. The previous day, Defendant and Ingram had boarded an airline flight to Los Angeles, California, reportedly—that is, according to prosecution witnesses—because they had learned of the police investigation and impending arrests. *Id.* While in California, Defendant cashed eight $1000 money orders that had been purchased in Oklahoma by individuals associated with the conspiracy. *Id.* at 4. According to prosecution witnesses, the money orders were purchased with drug proceeds and mailed to California for the benefit of Ingram. *Id.* at 3-4.

On December 9, 2014, Defendant boarded a return flight to Oklahoma City. *Id.* at 3. On February 17, 2015, officers acting on an anonymous tip were surveilling a house owned by suspected drug dealer and known gang member Anthony Anderson. *Id.* at 7. The officers observed Defendant and Ingram approach Anderson's house in a grey Kia and enter the house. *Id.* A few minutes later, Defendant and Ingram exited the house with a black bag and departed in the Kia. *Id.* at 8. Officers trailed the Kia and, after observing a traffic violation, signaled Defendant and Ingram to pull over. *Id.* Defendant and Ingram sped away and, after a high-speed chase, were apprehended with $4980 in cash and 26

baggies of crack cocaine. *Id.* at 9. Inside the Kia, officers discovered a number of incriminating items, including: (1) photos depicting Defendant and Ingram together with their coconspirators; (2) a parking pass and key fob for a Dallas apartment where officers later discovered large bundles of cash, a ledger reflecting $110,000 in outstanding drug debts, and a napkin on which Defendant's phone number was written; and (3) receipts memorializing a December 14, 2014 purchase in Culver City, California and a February 10, 2015 purchase in Dallas, Texas. *Id.* at 9-10.

The prosecution pieced together a timeline from travel records and the receipts found in the Kia. It theorized that Defendant, after returning to Oklahoma City on December 9, 2015, rented the Kia and drove back to Los Angeles to pick up Ingram. *Id.* at 16-17. The two men then drove to Dallas, rented the apartment, and ultimately returned to Oklahoma City where they were apprehended on February 17, 2015. *Id.*

At trial, the jury was presented with overwhelming evidence of Defendant's participation in the drug-trafficking and money-laundering conspiracy. That evidence includes, but is not limited to the following:

- evidence of Defendant's gang affiliation, *id.* at 15.;

- evidence of Defendant's "close connection to Ingram," *id.* at 15;

- evidence that Defendant attempted to flee law enforcement after departing the home of a suspected drug dealer and known gang member, *id.*;

- evidence that Defendant was driving a rental car where police discovered 650.7 grams of crack cocaine, *id.* at 16;

- evidence that Defendant had no legitimate source of income sufficient to fund the money orders, *id.* at 6;

3

- evidence supporting a timeline whereby Defendant "(1) flew [from Los Angeles] . . . to Oklahoma City and rented the Kia, (2) drove the Kia from Oklahoma City back to Los Angeles to pick up Ingram, (3) drove Ingram from Los Angeles to Dallas to rent [the specified Dallas] apartment. . . , and (4) drove Ingram from Dallas back to Oklahoma City," where, on February 17, 2015, Defendant and Ingram were apprehended with $4980 in cash and 26 baggies of crack cocaine, *id.* at 16-17;

- evidence that Defendant cashed eight money orders "in a manner consistent with structuring to avoid filing and reporting requirements," *id.* at 18; and

- evidence that "the names of people associated with [Defendant] were used to mail the money orders," *id.* at 21.

Defendant timely filed the instant motion on June 28, 2018, alleging ineffective assistance of counsel. *See* Def.'s Mot. (Doc. No. 1005) at 4, 14-32. Specifically, Defendant contends that his trial counsel was ineffective because he: (1) failed to interview and present testimony from prospective witnesses; (2) failed to adequately cross-examine prosecution witnesses; (3) failed to subpoena airline records; (4) failed to object to testimony regarding Defendant's gang affiliation; (5) failed to object to testimony regarding travel with Daryl Ingram; (6) elicited hearsay testimony regarding Defendant's knowledge of the investigation; (7) failed to introduce into evidence an airline itinerary and receipt; and (8) advised Defendant against testifying in his own defense.

ANALYSIS

To show that his counsel's performance was constitutionally ineffective, Defendant must demonstrate that the performance of counsel was deficient and that such deficiency prejudiced the outcome of the case. *See Strickland v. Washington*, 466 U.S. 668 (1984).

To establish the first prong of the *Strickland* test—that counsel's performance was deficient—Defendant must show that counsel's behavior was unreasonable under

"prevailing professional norms." *Id.* at 688. The Supreme Court shuns specific guidelines for measuring deficient performance, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. Defendant must overcome the presumption that the "challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "For counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999).

Even if Defendant shows deficient performance, he must also show prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. In making that determination, the court must "tak[e] the unaffected findings as a given" and decide whether the outcome "would reasonably likely have been different absent the errors." *Id*. at 696.

The Court "may address the performance and prejudice components in any order" and "need not address both if [Defendant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998).

I.   *Failure to Interview and Present Testimony from Prospective Witnesses*

Defendant first complains that, despite his "specific[] instruct[ion]," counsel failed to interview and present testimony from two prospective witnesses: (1) Matt Maples, Defendant's boss at Rufnex Oil Company; and (2) Detective Keith Medley of the Oklahoma Police Department. Def.'s Mot. at 20-21. Defendant further criticizes counsel's failure to present testimony from Sheba Fisher, who "was on the Government's witness list for trial" but "[f]or whatever reason" was not called to testify. *Id.* at 24-25.

According to Defendant, Maples would have "confirm[ed] [Defendant's] employment" and would have further testified "that [Defendant] had told [Maples] . . . of his planned trip to California a full three (3) weeks before [Defendant] left." *Id.* at 20. The absence of Maples' testimony, Defendant argues, allowed the jury to infer: (1) "that [Defendant] did not have a 'legitimate source of income,'" which implied his involvement in the charged conspiracy; and (2) "that the trip to California was an attempt to flee law enforcement," which, in turn, "allowed the jury to infer that [Defendant] shared [in] the conspiracy's common purpose or design." *Id.* at 28.

Defendant submits that Detective Medley would have testified to the impossibility of cooking crack cocaine in a 15-minute period, which would have undermined the government's suggestion "that Ingram manufactured 650 grams of cocaine base" during the few minutes that "he and [Defendant] were inside Anthony Anderson's house on February 17, 2015." *Id.* at 25-27.

With respect to Sheba Fisher, Defendant argues that her testimony would have "refute[d] the Government's contention that the only way her name came to be on the

6

mailings is through her association with [Defendant]" and would have "cast doubt on the information she provided to law enforcement." *Id.* at 24-25. The absence of Fisher's testimony, Defendant urges, "impressed on the jury that Fisher only knew [Defendant], thus allowing the jury to infer [Defendant]'s participation in the money laundering conspiracy." *Id.* at 30.

Defendant's speculation regarding the anticipated testimony of these uncalled witnesses is insufficient to show prejudice under *Strickland*. *Cf. United States v. Smith*, 421 F. App'x 889, 900 (10th Cir. 2011) (finding that speculation regarding content of possible testimony and impact of such testimony on jury verdict was "clearly insufficient" to prove prejudice). "[T]he speculative witness is often a two-edged sword," as the Tenth Circuit has observed, "[f]or as easily as one can speculate about favorable testimony, one can also speculate about unfavorable testimony." *Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008). Defendant fails to establish that Maples, Medley, or Fisher would in fact "have testified at trial" or that their testimony would "have been favorable" to Defendant. *Snow v. Sirmons*, 474 F.3d 693, 730 n.42 (10th Cir. 2007) (internal quotation marks omitted); *accord United States v. Clark*, 650 F. App'x 569, 572 (10th Cir. 2016) (agreeing with district court that counsel's "failure to interview [the defendant's] suggested witnesses" did not amount to ineffective assistance of counsel where "[f]or five of them, [the defendant] did not provide affidavits to show what they would have testified to" and, for the two who did provide affidavits, "the affidavits did not indicate that they would have testified on [the defendant's] behalf at trial"); *see also United States v. Gallant*, 562 F. App'x 712, 715-16 (10th Cir. 2014).

## II. Failure to Adequately Cross-Examine Prosecution Witnesses

Relatedly, Defendant contends that counsel failed to "properly" and "thoroughly" cross-examine two prosecution witnesses: (1) Robert Brister Jackson, Defendant's uncle; and (2) Postal Inspector Brian Hess. Def.'s Mot. at 22-23.

Defendant criticizes counsel for failing to "explore[] [the] relationship" between Jackson and Ingram. *Id.* at 22. Specifically, Defendant contends counsel should have "asked Jackson if he knew Daryl Ingram, or if he and Ingram knew each other outside of [Defendant]" and should have "ask[ed] Jackson about a search warrant executed on his home in which property of Ingram's was confiscated." *Id.* This line of questioning, according to Defendant, would have elicited testimony "explain[ing] how Jackson's name was used to send mail to California" and refuting the prosecution's implication "that [Defendant] is the only one that had a relationship with Jackson." *Id.* at 22, 29.

With respect to Inspector Hess, Defendant argues that counsel should have questioned him regarding "postal service policy and/or standard operating procedure." *Id.* at 23. This testimony, Defendant submits, would have supported Defendant's contention "that the reason he cashed the money orders in California in the manner he did was because the Post Office would not allow him or anyone else to cash more than two at a time." *Id.*

Again, Defendant's argument is based on pure speculation. *See Smith*, 421 F. App'x at 900; *Boyle*, 544 F.3d at 1138. Defendant provides no evidence that, had counsel pursued his suggested lines of questioning, Jackson or Hess would have testified as predicted. Accordingly, Defendant has not adequately shown prejudice even assuming counsel's performance was deficient. *See Smith*, 421 F. App'x at 900; *Boyle*, 544 F.3d at 1138.

8

## III. Failure to Subpoena Airline Records

Defendant next faults counsel for "fail[ing] to subpoena additional flight records despite [Defendant] telling him to do so." Def.'s Mot. at 20. According to Defendant, the flight records "would have shown that [he] flew back to Oklahoma City from California alone, on January 29, 2015,"[3] and that his coconspirator Daryl Ingram "flew from California to Dallas[,] Texas[,] a few weeks later." *Id.* at 21. This information, Defendant contends, would have "disproven the Government's version of events during the time of November 2014 through February 2015"—specifically, that on December 9, 2014, Defendant "(1) flew [from Los Angeles] . . . to Oklahoma City and rented the Kia, (2) drove the Kia from Oklahoma City back to Los Angeles to pick up Ingram, (3) drove Ingram from Los Angeles to Dallas to rent [the specified Dallas] apartment, and (4) drove Ingram from Dallas back to Oklahoma City," where, on February 17, 2015, Defendant and Ingram were apprehended with $4980 in cash and 26 baggies of crack cocaine.[4] *Id.* at 21, 28 (quoting Order & J. at 16-17).

Defendant has not established prejudice resulting from counsel's failure to subpoena the flight records at issue. As an initial matter, Defendant has not shown that the records

---

[3] Defendant elsewhere represents that the records in question would have shown that he "flew back to Oklahoma City from Los Angeles by himself on January 22, 2015." Def.'s Mot. at 29; *see also* Ex. 2 to Def.'s Motion (Doc. No. 1005-2) ¶ 20.

[4] Defendant further states that this information "would have validated [Defendant's] claim that Ingram unexpectedly called [Defendant] the afternoon of February 17, 2015[,] while [Defendant] was submitting job applications." *Id.* at 21. However, Defendant fails to explain how the flight records would have confirmed the alleged February 17, 2015 phone call or the relevance of that phone call in the context of Defendant's convictions.

9

are irreconcilable with—and thus "disprove"—the timeline presented by the government. At any rate, the government's timeline was only one of "several ways the jury could have concluded that [Defendant] . . . facilitated the conspiracy's objective." Order & J. at 16. Defendant has not demonstrated that the remaining evidence tying him to the conspiracy would have been insufficient to support his conviction.

Defendant additionally argues that counsel's failure to procure and present the flight records "allowed the jury to infer that [Defendant] and Ingram were constantly in one another[']s company." Def.'s Mot. at 28. Again, Defendant has not demonstrated prejudice. It was undisputed at trial that Defendant and Daryl Ingram were "close friends" who took multiple trips together. Trial Tr. (Doc. No. 887) 56:16-57:3. The time they spent in each other's presence was heavily documented, e.g., by pictures, video footage, and testimony, and such evidence was shown to the jury. *See id.* at 1158:12-1160:8, 2008:20-2010:12. Flight records showing that Defendant made an isolated trip from California to Oklahoma City without Ingram would not preclude the inference that the two were frequently together. Nor would it meaningfully undermine the overwhelming evidence supporting Defendant's involvement in the conspiracy.

IV. *Failure to Object to Testimony Regarding Defendant's Gang Affiliation*

Defendant's third complaint—that "[c]ounsel failed to object to Agent Sch[w]eers['] hearsay testimony of [his] alleged gang membership"—can be disposed of because it is belied by the record. Def.'s Mot. at 21. The trial transcript reflects that counsel for codefendant Michael Banks objected to the testimony at issue and that counsel

for Defendant joined in the objection.[5] *See* Trial Tr. 102:19-21; *Clark*, 650 F. App'x at 571 (rejecting defendant's contention "that counsel was ineffective for failing to object to his criminal-history calculation" where the record showed that counsel did in fact object to the calculation).

V.   *Failure to Object to Testimony Regarding Travel with Daryl Ingram*

Defendant further criticizes counsel for "fail[ing] to object to Agent Sch[w]eers' speculation" that Defendant was traveling with Daryl Ingram "between November 6, 2014 and February 17, 2015."[6] Def.'s Mot. at 22 (citing Trial Tr. 126:3-8). Defendant asserts that he "repeatedly told counsel" that Defendant and Ingram "did not spend a lot of time together" during that period and provided "documentary evidence" and "contact information" for witnesses who could testify to that effect. *Id.*

Defendant has not overcome the presumption that counsel's failure to object to the testimony "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted); *see also Snow,* 474 F.3d at 721; *Yarrington v. Davies*, 992 F.2d 1077, 1080 (10th Cir. 1993) ("Mere failure to object to evidence does not render an attorney ineffective"). As noted, it was undisputed at trial that Defendant and Daryl Ingram were "close friends" and that they took several trips together. Trial Tr. 56:16-57:3. Indeed, evidence of flights presented to the jury and submitted in support of Defendant's Motion

---

[5] After receiving argument on the issue, the Court ruled the testimony admissible. *See* Trial. Tr. 105:17 to-20.

[6] In the exchange at issue, Agent Schweers testified that "between the dates of November 6th and February 17[,] [2015]," Daryl Ingram was "[p]rimarily [in] California and Texas" "with [Defendant]." Trial Tr. 126:3-8.

11

confirm that the two traveled together during the relevant time period. *See* Gov't Ex. 2400 (Doc. 1015-2) at 7-8; Ex. 1 to Def.'s Mot (Doc. No. 1005-1). In light of this evidence, counsel may have concluded that any objection to Agent Schweers' testimony would have been futile and/or that it would have unduly emphasized the time Defendant spent with Ingram.

Moreover, Defendant has not shown a "reasonable probability" that, but for counsel's failure to object, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As noted, there was ample evidence that Defendant and Ingram were frequently together. *See* Trial Tr. 1158:12-1160:8, 2008:20-2010:12. Likewise, there was ample evidence, apart from Defendant's relationship with Ingram, of Defendant's involvement in the conspiracy.

*VI. Eliciting of Hearsay Testimony Regarding Defendant's Knowledge of the Investigation*

Defendant criticizes counsel for "elicit[ing] improper hearsay testimony regarding [Defendant]'s knowledge of the investigation prior to his flight" and then "fail[ing] to ask the court to strike the testimony." Def.'s Mot. at 23 (citing Trial Tr. 1217:1-25). In the cited exchange, counsel asked Lieutenant Matt McRorie whether there was "any evidence that [Defendant] was aware [of the investigation]" before he flew to California with Daryl Ingram on November 6, 2014. Trial Tr. 1217:8-9. McRorie responded that the only evidence consisted of "statements . . . of people that were in contact with [Defendant]." *Id.* at 1217:10-15. On further questioning, McRorie stated that he couldn't "recall specifically

12

what the witnesses said"; nor was he able to identify any of the alleged witnesses by name. *Id.* at 1217:19-25.

Again, Defendant has not overcome the presumption that counsel's decision to pursue this line of questioning "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted); *see also Snow,* 474 F.3d at 721. As counsel explains in his supporting affidavit, he "did not find McRorie's testimony . . . credible" because he "failed to provide . . . the names of the witnesses, . . . [the] dates of their respective statements, . . . the bases for [their] statements, . . . and [their] exact statements." Crawford Aff. (Doc. No. 1015-1) at 18. Thus, counsel "did not believe [McRorie's testimony] hurt [Defendant]'s case" and perceived "no need to strike [it]." *Id.*

What's more, Defendant has not attempted to demonstrate a "reasonable probability" that, but for the alleged error, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

VII. *Failure to Introduce into Evidence an Airline Itinerary and Receipt*

Defendant next complains that counsel failed to present a flight itinerary provided to him by Defendant. Def.'s Mot. at 23. The itinerary, which is attached as Exhibit 1 to Defendant's Motion, indicates that on October 30, 2014, Raven Tanike Barnes used a credit card to purchase round-trip airline tickets on behalf of Defendant and Daryl Ingram for travel between Oklahoma City and Los Angeles, specifically: (1) a flight from Oklahoma City to Los Angeles on November 6, 2014; and (2) a flight from Los Angeles to Oklahoma City on November 10, 2014. *See* Ex. 1 to Def.'s Mot. This evidence, Defendant claims, would have undermined "the Government's narrative that [Defendant] learned of the

13

investigation and fled [to California] with Ingram" and would have "also discredited the reliability of the flight chart [Gov. Ex. 2400] the Government used at trial," which "suggested that the tickets were one way tickets that cost $333.95 each and were paid for in cash." Def.'s Mot. at 24.

Again, Defendant has not shown a "reasonable probability" that, but for counsel's failure to introduce the flight itinerary, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The possibility that the tickets were purchased one week prior to the November 6, 2014 flight is not inconsistent with the prosecution's theory that Defendant and Ingram fled to California after learning about the investigation. Indeed, the prosecution presented testimony that Ingram and his coconspirators knew about the investigation and impending arrests at least one week prior to the execution of the search warrants on November 7, 2014. *See* Trial Tr. 353:25-355:9.

Moreover, while the itinerary might have caused the jury to question the reliability of the information presented in the flight chart, that does not mean that it would have prompted a different result. Even if the flight chart contained errors, the jury was presented with the source documents providing the correct information. Government Exhibit 2402 provides the same information as the itinerary attached to Defendant's Motion. *See* Ex. 2 to Pl.'s Resp. (Doc. No. 1015-2) at 18. And Defendant has not established that the remaining evidence of his involvement in the conspiracy would have been insufficient to sustain his conviction.

VIII. *Advising Defendant Against Testifying in His Own Defense*

Defendant's final complaint is that counsel "coerced [him] not to take the stand in his own defense by telling [him] that the Government had not proven [its] case, and that [Defendant] taking the stand was a 'bad idea' and would hurt his case and cause him to lose and therefore go back to prison." *See* Def.'s Mot. at 27. Defendant argues that, as a result, the jury was "deprived . . . of [Defendant's] account of events," which "allowed the jury to accept the Government's theory as fact." *Id.* at 31.

Defendant has not, as he must, established that counsel's advice was "completely unreasonable." *Boyd*, 179 F.3d at 914. Indeed, counsel's advice was consistent with a trial strategy that yielded an acquittal on Defendant's earlier drug charges. *See* Minute Entries (Doc. Nos. 84, 87, 91), Case No. CR-15-53-G (W.D. Okla.) (showing that the defense rested without Defendant taking the stand and Defendant being acquitted).

Moreover, Defendant has not established prejudice. While regretting that he was unable to relay "[his] account of events," Defendant fails to "set forth any specifics regarding what he would have testified to." *United States v. Solarin*, 383 F. App'x 772, 774 (10th Cir. 2010); *see also Tafoya v. Gunter*, No. 95-1237, 1996 WL 80473, at *2 (10th Cir. Feb. 26, 1996) (defendant failed to establish prejudice stemming from counsel's advice that he not testify where he "neglect[ed] to specify or explain the favorable significance of the lost testimony in question"). Accordingly, Defendant has not demonstrated "that the result of the trial would have been different had [he] testified." *Underwood v. Massie*, 75 F. App'x 747, 749 (10th Cir. 2003).

CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a defendant. A COA may issue only upon "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Upon consideration, the Court concludes that the requisite standard is not met in this case. Therefore, a COA is denied.

CONCLUSION

It is therefore ORDERED that Defendant's Motion to Vacate, Set Aside, or Correct Sentence (Doc. No. 1) under 28 U.S.C. § 2255 is DENIED. It is further ORDERED that a certificate of appealability is DENIED. A separate judgment shall be entered.

IT IS SO ORDERED this 19th day of February, 2020.

_____
CHARLES B. GOODWIN
United States District Judge